1
2
3
4

**FILED**
CLERK, U.S. DISTRICT COURT

Oct 13, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ PMC _____ DEPUTY

5
6
7

8   UNITED STATES DISTRICT COURT

9   CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| EQUALS THREE, LLC a California limited liability company, ) ) | CASE NO. 2:14-cv-09041-SVW-MAN |
| Plaintiff, ) ) | ORDER GRANTING IN PART AND DENYING IN PART JUKIN MEDIA, |
| v. ) ) | INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND |
| JUKIN MEDIA, INC., a California corporation, and DOES 1 through 50, inclusive, ) ) ) | JUDGMENT [34] |
| Defendants. ) | |

11
12
13
14
15
16
17

18   **I.   INTRODUCTION**

19          This copyright action centering around funny videos presents issues that are anything but

20   simple.  The instant motion requires the Court to evaluate whether a humorist's use of "viral

21   videos"[1] is a fair use.  This complicated inquiry requires this Court to make distinctions along the

22   fuzzy boundaries between commenting on humorous videos in a transformative manner and

23   simply exploiting them for their inherent humor without paying the customary price.

24          On November 21, 2014, plaintiff and counterclaim defendant Equals Three, LLC

25   ("Equals Three") sued defendant and counterclaimant Jukin Media, Inc. ("Jukin") for a

26

27   _____

[1]  A viral video is "a video that becomes popular through the process of (most often) Internet
28   sharing, typically through video sharing websites, social media, and email."  (Compl. ¶ 19 n.2)
     (quoting Viral Video, WIKIPEDIA, http://en.wikipedia.org/wiki/Viral_video).

declaratory judgment and for relief under § 512(f) of the Digital Millennium Copyright Act ("DMCA") (which prohibits fraudulent use of DMCA takedown notices).  Jukin counterclaimed, asserting that Equals Three infringes nineteen of its copyrights.  Presently before the Court is Jukin's motion for partial summary judgment regarding fair use.  (Dkt. 34.).  For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Jukin's motion for summary judgment.

## II.   FACTUAL BACKGROUND[2]

Jukin is a digital media company that amasses a library of user-generated internet video clips to license on the clip creators' behalf. (Def.'s SUF ¶¶ 1–2, 4, 12.)  Jukin employs a research and acquisitions team of eleven people to scour the internet for videos likely to "go viral"—become sensationally popular.  (Def.'s SUF ¶¶ 13–18.)  Jukin's employees then locate the videos' creators and enter licensing agreements with them.[3]  (Def.'s SUF ¶ 19–24.)  Jukin has a library of over 17,000 short-form videos.  (Def.'s SUF ¶ 4.)

Jukin uploads these videos to its YouTube multi-channel network and to Jukin's own content-focused websites.  (Def.'s SUF ¶¶ 5, 8.)  Jukin also uses these videos to create "digital productions," which Jukin distributes on its YouTube multi-channel network and websites. (Smith Decl. ¶ 7.)  Beyond arguing that these productions are original, Jukin does not offer evidence regarding the precise nature and content of these "digital productions."  Jukin also monetizes its videos via ad-supported or subscription-based third-party syndicators, which take responsibility for content distribution and use Jukin's videos to generate advertising revenue.  (Def.'s SUF ¶ 9.)  Media partners also pay to sponsor a particular compilation of Jukin's videos.  (Def.'s SUF ¶ 10.)  Finally, Jukin promotes its videos to and licenses them for use on traditional media platforms, such as television and cable shows.  (Def.'s SUF ¶ 146.)  Jukin's partners include "the what da faq show" and "The Young Turks"—which Jukin describes as YouTube shows that are similar to Equals Three's show.  (Def.'s SUF ¶ 152.)

---

[2]  To the extent that the Court relies on disputed evidence or facts without addressing objections in this section or in its analysis below, any objections raised are overruled.

[3]  The Court notes that Jukin does not proffer any actual licensing agreements that it has entered with content creators.  The Court further notes the issues (discussed below)

Equals Three does not dispute the fact that Jukin's partner's include these two shows, but argues that the shows are distinct from Equals Three's show.  In support of this argument, Equals Three offers the declaration of its executive producer Kadiatou Martin ("Martin").  Martin states that: (1) "The Young Turks" is distinguishable from Equals Three because "it is a politically-charged news and current events show"; and (2) "the what da faq show" is distinguishable from Equals Three because it "is in Spanish, it plays viral videos one after another in no particular arrangement, and the host offers few remarks."  (Martin Decl. ¶ 9.)

Equals Three produces short humor programs which it broadcasts via YouTube.  (Def.'s SUF ¶ 30, 32.)  Its humor programs typically involve a host who gives an introduction, shows parts of video clips[4] (which are usually shown in edited form and inset within a decorative graphical frame) and remarks about the events and people presented in the clip.  (Martin Decl., Ex. B.; Def.'s SUF ¶ 32; Pl.'s SUF ¶¶ 157, 162.)  In each episode, "the host weaves an originally-crafted humorous story theme throughout the episode using multi-media content—text, graphics and animation, sound effects, voice overs, and video clips—to enhance and develop the story."[5]  (Pl.'s SUF ¶ 157.)  Often portions of the viral video are shown more than once during a single Equals Three episode.  (Def.'s SUF ¶ 34.)  The "host will frequently offer an originally-authored monologue, and will provide spoken and performed commentary on the various video clips, including facial expressions, sarcastic remarks, derisive commentary, sexual innuendo, and social commentary directly targeting and referencing the people, events, and circumstances depicted in the Source Videos."  (Pl.'s SUF ¶ 162.)  Each program is roughly five minutes long and typically features three segments, each of which centers around a different video.  (Def.'s SUF ¶ 32, Johnson Decl. ¶ 6–7; Landry Decl. ¶¶ 4–5.)  Equals Three also offers its executive producer's declaration that "[s]tylistically, the E3 Episodes feature frequent jump cuts" and are "edited to appeal to . . . fast-paced tastes[.]" (Martin Decl. ¶ 3.)

---

[4]  Of Equals Three's 268 episodes, 220 episodes show three clips, one episode shows five clips, and 47 episodes show one clip.  (Johnson Decl. ¶ 7.)

[5]  Jukin does not dispute that the Equals Three episodes include such elements, but argues that they are not original because Equals Three admits to copying others' content and because Equals Three purportedly "add[s] nothing except effects and commentary to 'drive the story.'" (Def.'s Rep. to Pl.'s SUF ¶ 157.)

Equals Three typically obtains source footage for its show by scouring the Internet for source videos.  (Pl.'s SUF ¶ 159.)  Jukin argues that Equals Three directly targets its videos, but fails to offer any evidence beyond rank speculation proving this fact.  *See* (Smith Decl. ¶ 47.) Equals Three provides its creator's declaration that Equals Three does not target Jukin.  (Johnson Decl. ¶ 12.)

It is undisputed that Equals Three uses portions of Jukin's videos without paying a licensing fee.[6]  Each of the subject source clips from Jukin is a user-generated video featuring either a slapstick-style mishap, an animal in a humorous situation, or simply a cute video of an animal (such as a dachshund chasing a crab on the beach).  (Ramas Decl., Ex. 1; Marti Decl., Ex. B.)  Jukin asserts that Equals Three infringed on its videos as follows:

| **Equals Three Episode** | **Jukin Video** |
| --- | --- |
| 1.  The Resurrection | 1.  Black Bear Milk Bottle Rescue |
| 2.  Like a Girl | 2.  Disney World Surprise Gone Wrong |
| 3.  High on Killer Wasp Spray | 3.  Funny . . . Wasp stings man while wife laughs! |
| 4.  Drunk Babies | 4.  Groom drops bride |
| 5.  Blazing Crow—Key & Peele | 5.  Insane Dodge Ball Kill! |
| 6.  Boat Trick Accident | 6.  Skim Board Fail |
| 7.  Fun with Rednecks! | 7.  Road worker trick fail<br>8.  Dog Gets Spoon Fed |
| 8.  Itchy Balls | 9.  Dog thinks terrace door is closed |
| 9.  Wiener Crabs | 10.  Dachshund v. Crab |
| 10.  So Long Ray | 11.  Went beautifully |
| 11.  Skydiving Accident | 12.  Skydiving Plane Crash Incident |
| 12.  Sheep to the Balls | 13.  First person to buy iPhone 6 in Perth drops it on live TV when pressured by reporters |

---

[6]  The Court notes that Equals Three asserts that a few of the subject episodes do not actually use Jukin's videos, but rather use similar source footage.  The Court does not reach this issue because the dispute is immaterial to the instant motion.

| 13. Bear Thief | 14. Edelweiss Bear Take Out 2 |
| 14. I HAVE SUPER POWERS | 15. trampoline hump dog |
| 15. Gallon Smash Prank | 16. Burning My Hair Off |
| 16. Train Orgasm | 17. MOMMY'S BIG SECRET :) THIS IS A MUST SEE!!!!! |
| 17. How to shoot up in the woods | 18. 500 Smith&Wesson tree fail. |
| 18. Hottest New Jam | 19. Camera Falls From Airplane and Lands in Pig Pen |

(Martin Decl. ¶ 13.)  It is undisputed that each of the allegedly infringed Jukin videos was published before Equals Three's alleged use of that video.  (Pl.'s SUF ¶ 159.)

On March 12, 2014, Equals Three 's then-host Ray William Johnson announced that the Equals Three show would be going on hiatus to find a new host.  (Johnson Decl. ¶ 14.)  When Jukin heard that Equals Three was to resume its broadcasts, Jukin contacted Equals Three to inform Equals Three that any use of Jukin's videos would be considered infringing.[7]  (Def.'s SUF ¶ 35.)  Jukin's letter indicates that Jukin is willing to negotiate a license agreement and indicates that Equals Three's willingness to link to and credit Jukin's content is not sufficient.  (Smith Decl., Ex. A.)  It is undisputed that no license agreement resulted.

On July 16, 2014, Equals Three resumed broadcast and published its episode titled "The Resurrection" to YouTube.  (Def.'s SUF ¶ 37.)  It is undisputed that "The Resurrection" used Jukin's video "Black Bear Milk Bottle Rescue."  (Def.'s SUF ¶ 44.)

On July 17, 2014, Equals Three responded to Jukin's July 9 letter.  (Def.'s SUF ¶ 38.)  On July 25, 2014, Jukin sent a letter to Equals Three's counsel with an attached invoice for Equals Three's use of Jukin's videos.[8]  (Def.'s SUF ¶¶ 39–40.)  Jukin argues that Equals Three never responded to the July 25 letter, never paid the invoice, and never attempted to negotiate a

[7]  Equals Three asserts that Jukin sent this letter to an individual who was not affiliated with or authorized to act on behalf of Equals Three.  However, Equals Three does not dispute that it was notified of the letter.  Moreover, this dispute is irrelevant to the instant motion.

[8]  The invoice was addressed to the same purportedly unaffiliated individual as the July 9 letter.  As noted above, this dispute is immaterial for the instant motion.

1  license.  (Def.'s SUF ¶ 41.)

2  Equals Three asserts that since May 1, 2014, Jukin has filed at least 41 copyright

3  infringement claims with YouTube regarding Equals Three's episodes.  Once such a claim is

4  filed against an Equals Three episode, Equals Three can no longer earn advertising revenue from

5  that episode.  (Pl.'s SUF ¶ 168.)  Additionally, once Jukin has filed a claim against the episode

6  Jukin can place advertisements on the episode redirecting viewers to its own YouTube channel.

7  (Pl.'s SUF ¶ 169.)

8  The parties agree that the fair use issue is ripe for adjudication and that this issue may be

9  dispositive of the case.  At the status conference held on February 9, 2015, the Court set a

10  briefing schedule regarding the instant motion for summary judgment.  (Dkt. 29.)

11  **III.    LEGAL STANDARD**

12  Federal Rule of Civil Procedure 56 requires summary judgment for the moving party

13  when the evidence, viewed in the light most favorable to the nonmoving party, shows that there

14  is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a

15  matter of law.  Fed. R. Civ. P. 56(a); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th

16  Cir. 1997).

17  The moving party bears the initial burden of establishing the absence of a genuine issue

18  of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  On an issue for

19  which the moving party does not have the burden of proof at trial, the moving party may satisfy

20  this burden by "'showing'—that is, pointing out to the district court—that there is an absence of

21  evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Once the moving

22  party has met its initial burden, the nonmoving party must affirmatively present admissible

23  evidence and identify specific facts sufficient to show a genuine issue for trial.  *See id.* at 323-24;

24  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmoving party must "do more

25  than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*

26  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[A] jury is permitted to draw

27  only those inferences of which the evidence is reasonably susceptible; it may not resort to

28  speculation."  *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).  Thus, a

1   mere scintilla of evidence or evidence that is not significantly probative does not present a

2   genuine issue of material fact. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).

3         "To survive summary judgment, a party does not necessarily have to produce evidence in

4   a form that would be admissible at trial, as long as the party satisfies the requirements of Federal

5   Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001).

6   "At the summary judgment stage, we do not focus on the admissibility of the evidence's form.

7   We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036

8   (9th Cir. 2003).  Thus, even if evidence is presented upon a motion for summary judgment in a

9   form that does not strictly meet the requirements of the Federal Rules of Evidence, the Court will

10  still consider the evidence if it is apparent that the deficiency can be overcome at trial. *Id.* at

11  1037; *see also Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004.)

12  However, the Court may not consider inadmissible hearsay evidence that could not be presented

13  in an admissible form at trial.  *See Bliesner v. Commc'n Workers of Am.*, 464 F.3d 910, 915 (9th

14  Cir. 2006); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779, 779 n.27 (9th Cir. 2002)

15  (considering an appeal from a grant of summary judgment and affirming exclusion of evidence

16  under hearsay rules where the *contents* of two depositions were hearsay); *see also Stonefire*

17  *Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1037 (C.D. Cal. 2013); *Medina v.*

18  *Multaler, Inc.*, 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) (citing *J.F. Feeser, Inc. v.*

19  *Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir.1990)).

20  **IV.   DISCUSSION**

21        As a preliminary matter, the Court notes that Jukin does not submit any of the licensing

22  agreements granting it rights in the subject videos.  Additionally, Jukin has only submitted

23  copyright registration certificates for two of the subject videos.  (Counterclaim, Exs. A & B.)

24  Nevertheless, Equals Three provides the copyright registration numbers for 18 of the 19 subject

25  videos.  (Martin Decl. ¶ 13.)  The Court notes that the records for each of these registration

26  numbers indicate that Jukin is the copyright claimant for the subject video and that it obtained its

27  rights by written agreement.  In response to Jukin's proposed Statement of Undisputed Facts,

28  Equals Three argues that it is unclear whether Jukin obtained its rights from the actual copyright

owner and whether Jukin's rights include the right to assert copyright claims.  Equals Three rests this argument on Jukin's Chief Executive's statement in a newspaper article that the difficult part of the business for Jukin is finding the true owners of the videos it targets for acquisition. (Martin Decl., Ex. A.)  Regardless, the Court assumes *arguendo* for this motion that Jukin has validly obtained the rights to the videos at issue—including the right to assert copyright claims. Additionally, solely for purposes of the instant motion, the Court assumes *arguendo* that each of Equals Three's complained-of episodes actually used one of Jukin's videos.

### A.      RULE 56(d) REQUEST

Equals Three responds to many of the facts stated in Jukin's Statement of Undisputed Facts by stating that the fact is undisputed for purposes of the instant motion, but that if the Court finds that particular fact dispositive then Equals Three requests that the motion be denied so the parties can conduct discovery on that fact.  Jukin asserts that Equals Three waived its right to seek discovery for purposes of this motion when it agreed to present the fair use issue to the Court at this stage of the case.  Jukin also submits its counsel's declaration stating that she attended the parties' Rule 26(f) conference, at which they agreed that the fair use issue was ripe for adjudication.  (Bentz Decl. ¶ 2.)

Equals Three has not filed a separate declaration and request for discovery pursuant to Federal Rule of Civil Procedure 56(d).  Fed. R. Civ. P. 56(d); *see also Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1101 (9th Cir. 2006).  Additionally, the Court notes that Equals Three did not file any requests to continue its deadline to oppose the instant motion.  For the aforementioned reasons the Court DENIES Equals Three's request for additional discovery.

### B.      FAIR USE

"The fair use doctrine has been called the most troublesome in the whole law of copyright."  *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) (internal quotation marks omitted) (quoting *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661, 662 (2d Cir.1939) (per curiam)).  The Copyright Act provides that the fair use of a copyrighted work, "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. §

8

107.  In determining whether the use of a work is a fair use, courts should consider the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*  These factors should not be treated in isolation, and instead must be explored and weighed in light of copyright's purpose.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) The Supreme Court has found that transformative uses "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright" because such works generally further "the goal of copyright, to promote science and the arts[.]" *Id.* at 579.

### 1.    Purpose and Character of the Use

The key inquiry for the first statutory factor is "whether and to what extent the new work is 'transformative.'"  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 (9th Cir. 2007) (citing *Campbell*, 510 U.S. at 579).  A new work is transformative when it  does not "merely supersede the objects of the original creation but rather adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* (internal quotation marks omitted) (quoting *Campbell*, 510 U.S. at 579).  The "more transformative the new work, the less will be the significance of the other factors . . . that may weigh against a finding of fair use." *Morris v. Young*, 925 F. Supp. 2d 1078, 1084-85 (C.D. Cal. 2013) (alteration in original) (quoting *Campbell*, 510 U.S. at 579).  The preamble to § 107 lists criticism and comment as illustrative bases supporting fair use under this factor. *See Monge*, 688 F.3d at 1173.  Additionally, the Supreme Court has stated that parody has "an obvious claim to transformative value." *Campbell*, 510 U.S. at 579.  Nevertheless, there are no bright-line rules; fair use must be evaluated on a case-by-case basis by reference to the four statutory factors. *Id.* at 577.

Equals Three asserts that its episodes are transformative because they are parodies of the Jukin videos.  Jukin argues that Equals Three's episodes are not parodies because they do not critique Jukin's videos.  According to Jukin, Equals Three's episodes are, at most, satires of

society or some other subject in general.

A parody is a work that uses "some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Campbell*, 510 U.S. at 580.  In contrast, satire has been defined as a work "in which prevalent follies or vices are assailed with ridicule, or are attacked through irony, derision, or wit[.]" *Id.* at 581 n.15 (internal citations and quotation marks omitted).  Thus, "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 580–81.

Determining whether Equals Three's episodes parody Jukin's videos is a difficult and nuanced task.  As pertains to this case, Jukin's videos are typically short, "point-and-shoot" style depictions of events that actually happened.  These events typically have an unplanned or spontaneous aspect to them—such as an attempted boat stunt failing or a child having an unexpected reaction to the news of his mother's new pregnancy.  Jukin asserts that its videos' purpose is humor and entertainment.  (Mot. 17.)  It is difficult to say whether Equals Three's episodes, which undisputedly use graphics and narration to tell jokes about the events depicted in the videos, criticize these videos—which were themselves made to serve the purpose of humor and entertainment—or simply point out their inherent humor.

Nevertheless, even if Equals Three's episodes are not parodies, the episodes comment upon or criticize Jukin's videos.[9]  Equals Three's episodes directly respond to and highlight humorous aspects of Jukin's videos.  The episodes do so via the host's reactions to the videos, jokes, narration, costumes and graphics.  The host's narration does not simply recount what is shown in Jukin's videos; instead the host makes comments about Jukin's videos that highlight their ridiculousness by creating fictionalized narratives of how the events transpired, using similes, or by directly mocking the depicted events and people.  Equals Three's episodes also repeat portions of Jukin's videos multiple times within the same segment.

---

[9]  The foregoing discussion applies to each of the Equals Three episodes at issue except "Sheep to Balls," which is discussed below.

For example, the Equals Three episode entitled "The Resurrection" uses part of Jukin's video "Black Bear Milk Jug Rescue."  Jukin's video shows *inter alia* footage from a distance of the bear in a field, at least three attempts by a tractor's crane to grasp the milk jug on the bear's head, the crane successfully clasping and removing the jug from the bear's head, and the bear running away.  (Martin Decl. ¶ 15; Ramas Decl. Ex. 1.)  The Resurrection shows, *inter alia*, some shots of the crane next to the bear with the jug on its head, one unsuccessful attempt by the crane to grasp the jug, the crane successfully grasping and removing the jug, and part of the footage of the bear running away.  (Martin Decl. ¶ 15; Martin Decl., Ex. B.)  The host makes such comments as "playing the crane game at Chuckie Cheese's wasn't a waste of time" and compares using a crane to remove a jug from a bear's head to "fishing with a hand grenade." (Martin Decl. ¶ 15; Martin Decl., Ex. B.)  The Equals Three episode "Drunk Babies" uses part of Jukin's video "Groom drops bride."  (Martin Decl., Ex. B; Ramas Decl. Ex. 1.)  Drunk Babies shows Jukin's video the groom running while carrying his (presumed) bride, tripping, and falling on her.  (Martin Decl., Ex. B; Ramas Decl. Ex. 1.)  Drunk Babies shows the footage of the actual trip and fall multiple times with different graphics and commentary interspersed.  (Martin Decl., Ex. B; Ramas Decl. Ex. 1.)  The host makes such comments as "shit, he literally body-slammed his new bride" and describes the incident as an example of why you shouldn't wait to have sex until marriage because you get "way too excited."  (Martin Decl., Ex. B; Ramas Decl. Ex. 1.)

In plain terms, whether or not Equals Three's episodes criticize Jukin's videos, the events depicted in Jukin's videos are the butt of Equals Three's jokes.  Thus, the jokes, narration, graphics, editing, and other elements that Equals Three adds to Jukin's videos add something new to Jukin's videos with a different purpose or character.

This is not a case where the addition of minimal narration, an introduction, or text did not change the essential character of the original work.  *See, e.g.*, *Monge*, 688 F.3d at 1175–76 (finding that use of photos of celebrity couple's secret wedding in a magazine article was not transformative); *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) (reversing determination that use of video footage of Reginald Denny beating was fair use where the news station's voice-over didn't add anything new or transformative to what made the

11

footage valuable—a clear visual recoding of the beating).  This is also not a case where Jukin's videos are used "to get attention" or to "avoid the drudgery in working up something fresh."  *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 580).  For the aforementioned reasons, the Court FINDS Equals Three's episodes (except Sheep to Balls) highly transformative.  *Nat'l Ctr. for Jewish Film v. Riverside Films LLC*, No. 5:12-CV-00044-ODW, 2012 WL 4052111, at *3 (C.D. Cal. Sept. 14, 2012) (finding that defendants' use of footage was transformative where their voice-overs, editing, and overall production added something new to the underlying footage).

Equals Three's use of Jukin's videos is admittedly commercial.  Nevertheless, the commercial nature of the use is outweighed by the episode's transformativeness.  *See SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278–79 (9th Cir. 2013) (finding insignificant the commercial nature of defendant's work where defendant's use was transformative).

The one exception to the aforementioned analysis is Equals Three's episode entitled Sheep to Balls.  Sheep to Balls uses Jukin's video of the first person to buy an iPhone 6 in Perth dropping the phone.  According to Equals Three, it used this footage for the purpose of making two points: (1) "don't be first at shit"; and (2) Apple Inc.'s method of packaging iPhones at the top of the box is absurd.  (Martin Decl. ¶ 14.)  Equals Three thus admits that its purpose of using Jukin's video was to make two general, broad points that were not directly aimed at criticizing or commenting on the *video*.  The use of Jukin's footage to make these two points is akin to using news footage without adding anything transformative to what made the footage valuable—in this case a clear view of the first person to obtain the iPhone 6 in Perth dropping the phone upon opening its package.  *See Los Angeles News Serv.*, 109 F.3d at 1122.[10]

Finally, the Court does not find that Equals Three's purported bad faith in not obtaining a license mitigates against fair use.  "If the use is otherwise fair, then no permission need be

---

[10]  Moreover, *Los Angeles News Service* recognized that if the footage itself were the news item (i.e. if the fact that someone had been able to make such a clear tape of the beating was itself the news item) then the first factor would favor fair use.  *Id.* at 1121.  This distinction illustrates the difference between using Jukin's videos to comment on the videos themselves and using Jukin's videos gratuitously to illustrate a broader message.

1   sought or granted." *Campbell*, 510 U.S. at 585 n.18.  If using a song after requesting and being

2   denied a license does not show bad faith, then neither does failing to obtain a license and

3   continuing to use footage after being sent a demand letter.  *See id.* (finding that being denied

4   permission to use a work does not weigh against fair use).  Moreover, there is no evidence that

5   Equals Three did not in good faith believe that it was making fair use of Jukins' videos.  *See id.*

6   The Court is similarly unpersuaded by Jukin's argument that Equals Three unfairly reaps the

7   benefits from the time and money Jukin spends selecting its videos.

8          For the aforementioned reasons the Court FINDS that Equals Three's episodes, except

9   for Sheep to Balls, are highly transformative.  Thus, for all episodes except Sheep to Balls, this

10  factors weighs heavily in favor of fair use.  *See SOFA Entm't*, 709 F.3d at 1273 (finding that first

11  factor heavily favored fair use where defendant's use was transformative).

                        2.    Nature of the Copyrighted Work

13         This factor looks at the extent to which the copied work is creative and whether it is

14  unpublished.  *Monge*, 688 F.3d at 1177.  Courts recognize that creative works fall closer to the

15  core of copyright's protection.  *SOFA Entm't*, 709 F.3d at 1279.

16         Here, it is undisputed that Jukin's videos were all published before Equals Three used

17  them.  However, it is more difficult to determine the extent to which these works are creative.

18  The Ninth Circuit has recognized that a "point-and-shoot" photograph is not on the same level as

19  the works of famous photographers.  *See Monge*, 688 F.3d at 1177.  Nevertheless, the Ninth

20  Circuit has also found that just because a photograph "documents an event does not turn a

21  pictorial representation into a factual recitation."  *Id.*  Here, the largely "point-and-shoot" videos

22  do not exhibit the cinematic masterpiece of many famous film directors.  Nevertheless, the Court

23  cannot say that they convey mainly factual information.  *See SOFA Entm't*, 709 F.3d at 1279

24  ("While the entire episode of *The Ed Sullivan Show* or the individual performances may be near

25  to the core of copyright, the clip [at issue] conveys mainly factual information—who was about

26  to perform.").

27         Thus, the Court FINDS that the nature of Jukin's works is creative.  Nevertheless, the

28  copied work's creative nature is not particularly important where the new work is highly

transformative.  *See Kane v. Comedy Partners*, No. 00 CIV. 158 (GBD), 2003 WL 22383387, at

*5 (S.D.N.Y. Oct. 16, 2003) *aff'd*,  98 F. App'x 73 (2d Cir. 2004) (citing *Castle Rock*

*Entertainment. Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 144 (2d Cir.1998).

Moreover, the works were already published when Equals Three used them.  Thus, while this

factor favors Jukin, it carries only slight weight.

### 3.    Amount and Substantiality of the Portion Used

The third factor looks to "the quantitative amount and qualitative value of the original

work used in relation to the defendant's justification for the use."  *SOFA Entm't*, 709 F.3d at

1279.  Jukin does not argue that Equals Three uses its videos in their entirety.  Instead, Jukin

complains that Equals Three takes the most important parts of its videos—their "heart."

The Supreme Court has recognized that a parody may need to take a work's heart in

order to conjure up the original and achieve its parodic purpose.  *Campbell*, 510 U.S. at 588–89.

Equals Three asserts that it uses no more of Jukin's videos than is necessary to achieve its

purpose of criticizing and commenting on Jukin's videos.  The Court agrees.  Though Equals

Three uses the arguable heart of Jukin's videos, it does not show more than is reasonably

necessary to convey enough of the events to allow the host's jokes, comments, and criticisms to

make sense to the viewer and resonate.  *See id.* at 588.  The Court therefore FINDS that the third

factor favors fair use.

### 4.    Market Harm

The fourth factor looks to the "effect of the use upon the *potential market* for or value of

the copyrighted work."  *Monge*, 688 F.3d at 1180 (emphasis in original).  This inquiry requires

courts to consider both the extent of the harm caused by the alleged infringer and "whether

unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a

substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590

(internal quotation marks and citation omitted).  This inquiry must include harm to the market

for the original and harm to the market for derivative works.  *Id.*  However, the law does not

recognize a derivative market for critical works.  *Id.* at 592.  Market harm caused by effective

criticism that suppresses demand is not cognizable.  *Id.* at 591.  Instead, the only kind of harm

1   cognizable is market substitution—i.e. where the new work diminishes demand for the original

2   work by acting as a substitute for it. *Id.* at 591–92. Thus, where a work is transformative,

3   market harm may not so readily be inferred and there is no presumption of market harm. *Monge*,

4   688 F.3d at 1180–81.

5         Jukin argues that the market for its original videos is harmed because Equals Three

6   frequently copies its videos during the time when they are allegedly most valuable—shortly after

7   their publication. In support of this contention, Jukin offers only the declaration of Christina

8   Smith ("Smith"), its Vice President of Content Operations. Smith gives no foundation upon

9   which she basis this speculative conclusion. She simply makes the conclusory assertion that

10  Jukin's videos are "generally" most valuable within the initial days and weeks after their first

11  publication. (Smith Decl. ¶ 6.) Smith also acknowledges that sometimes an older video

12  becomes more popular and valuable only after Jukin promotes it. (*Id.*) Smith gives no specific

13  facts regarding the value of the videos at issue in the case before or after Equals Three used

14  them. Moreover, even assuming *arguendo* that the videos are more valuable shortly after

15  publication, focusing on harm from Equals Three's failure to pay a license risks circular

16  reasoning—if Equals Three's use is fair then no license fee is required by it or by other similar

17  users.

18        Jukin further argues that Equals Three's episodes usurp demand for Jukin's videos. In

19  support of this argument, Jukin offers evidence that it licenses its videos to shows which it

20  claims are similar to Equals Three's. However, as stated above, there is no cognizable derivative

21  market for criticism. Thus, Jukin's argument fails to the extent that Jukin claims harm to a

22  licensing market for shows that critique and mock its videos in the manner that Equals Three

23  does.[11]

24        Nevertheless, the Court must still consider the possibility that Equals Three's viewers use

25

26  [11]  This is thus distinguishable from a case where a news organization uses the plaintiff's news
    footage without paying a license fee. *Los Angeles News Serv.*, 108 F.3d at 1122–23. For similar
27  reasons, Jukin cannot claim harm to the market for its own derivative productions criticizing its
    own videos (if such productions—which do not appear anywhere in the record—exist). *See*
28  *Campbell*, 510 U.S. at 539 (finding that the lower court erred to the extent that it considered harm
    to the market for parodies of the original work).

the episodes as a substitute for Jukin's videos.  Jukin claims that viewers no longer need to watch

its videos after watching Equals Three's episodes; Equals Three claims that its episodes actually

increase Jukin's video's views.  Neither side submits admissible evidence strongly supporting its

position.  Jukin submits no admissible evidence showing that a single viewer actually watched

Equals Three's episode rather than Jukin's video or of any instance when it lost a deal to license

its videos.  Instead, Jukin relies on Smith's unfounded testimony that Equals Three's viewers no

longer need to watch Jukin's videos.  Jukin also relies on the conclusory statement of its Director

of Licensing, Andrew Dignan ("Dignan"), that Equal's Three's use of Jukin's videos decreases

their licensing values.  (Dignan Decl. ¶ 11.)  However, Dignan's only support for this statement

is that "[f]or instance, a potential licensee is less likely to license a video if they think others are

copying it for free.  Equals Three's use of Jukin's videos contributes to a culture of infringement

and gives the impression to other potential licensees that they also do not need a license to use

the content."  (*Id.*)  Dignan fails to offer sufficient foundation to support this broad,

unsubstantiated statement.

        To support its position, Equals Three relies primarily on its employees' inadequately

supported testimony and on unauthenticated statements purportedly from Equals Three's viewers

to show that its viewers also watch Jukin's videos.  Equals Three also speculates that when one

of its viewers wants to re-watch a particular source video or to share it on the internet, that

viewer will likely go to the video's original source (Jukin) rather than re-watching the Equals

Three episode.  Equals Three also submits evidence that there is no way for one of its viewers to

share a source video contained in an Equals Three episode without having the recipient watch

the entire Equals Three episode.  (Martin Decl. ¶ 26.)  Equals Three fails to submit admissible

evidence defining the relevant market.

        While the transformative nature of Equals Three's videos makes cognizable market harm

less likely, the Court cannot say that it is completely implausible that at least some viewers

would substitute Jukin's videos with Equals Three's videos.  Both videos are meant to be

humorous and the Court can imagine a fine line between the demand for the humorous original

and the humorous new work commenting thereon.  Nevertheless, there is no actual evidence of

any such harm and (as discussed above) Equals Three's episodes do not take excessively from Jukin's videos.  Thus, on this record, where any market harm remains hypothetical, the Court FINDS that this factor does not favor either party.[12]  *See Perfect 10*, 508 F.3d. at 1168 (finding that market harm factor favored neither party where potential market harm was hypothetical).

                    5.        Conclusion

The Court must now weigh the four factors in light of copyright's purpose.  *See id.*  In so doing, the Court notes that transformative works generally further copyright's goal of promoting the arts and sciences.  *Campbell*, 510 U.S. at 579.

Here, Equals Three's episodes (except Sheep to Balls) are highly transformative and use of Jukin's videos only what is reasonably necessary to achieve their transformative purpose.  The first and third factors thus strongly favor fair use.  There is no proof of cognizable harm to any actual or potential market, and thus the fourth factor favors neither party.  Moreover, though the second factor weighs against fair use, it is of little weight in light of Equals Three's episodes transformativeness.  Moreover, Jukin's videos were published before Equals Three used them. Thus, on balance, the factors weigh in favor of fair use for all episodes except Sheep to Balls. Therefore Jukin (as the movant) has failed to carry its burden of showing that it is entitled to judgment as a matter of law regarding whether these episodes are fair use.  However, as discussed above, Sheep to Balls is not transformative and is likely to cause market harm.  Thus, Sheep to Balls does not make fair use of Jukin's video "First person to buy iPhone 6 in Perth drops it on live TV when pressured by reporters."

For the aforementioned reasons, the Court GRANTS IN PART Jukin's motion for summary judgment to the extent that Jukin asserts that Sheep to Balls is not a fair use.  In all other respects, the Court DENIES Jukin's motion.

---

[12]  This analysis does not apply to Sheep to Balls.  As discussed above, Sheep to Balls is not transformative and thus is likely to cause market harm by usurping demand for a cognizable derivative market.

**V.    ORDER**

1.  For the aforementioned reasons, the Court GRANTS IN PART Jukin's motion for summary judgment to the extent that Jukin asserts that Sheep to Balls is not a fair use, and ENTERS PARTIAL JUDGMENT in Jukin's favor to that effect.

///

2.  For the aforementioned reasons, the Court DENIES Jukin's motion for summary judgment in all other respects.

**IT IS SO ORDERED.**

Dated: October 13, 2015

_____
        STEPHEN V. WILSON
        United States District Judge