UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| EQUALS THREE, LLC, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) CV14-09041-SVW |
| | ) |
| JUKIN MEDIA, INC., ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |


**REPORTER'S TRANSCRIPT OF OPENING STATEMENTS**

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 1, 2016

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-H
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFF:       THOMAS H. VIDAL
                          ABRAMS GARFINKEL
3                         MARGOLIS AND BERGSON LLP
                          5900 WILSHIRE BOULEVARD
4                         SUITE 2250
                          LOS ANGELES, CA 90036
5

6
     FOR DEFENDANTS:      JESSICA L. GRANT
7                         VENABLE LLP
                          505 MONTGOMERY STREET
8                         SUITE 1400
                          SAN FRANCISCO, CA 94111
9
                          TAMANY VINSON BENTZ
10                        VENABLE LLP
                          2049 CENTURY PARK EAST
11                        SUITE 2100
                          LOS ANGELES, CA 90067
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 1, 2016

2

3                       11:00 AM

4                     - - - - -

5

6          **(THE PRIOR PROCEEDINGS WERE HELD, BUT ARE**

7          **NOT TRANSCRIBED HEREIN)**

8          **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

9          **OPEN COURT IN THE PRESENCE OF THE JURY:)**

10          MR. VIDAL:  GOOD MORNING.

11              AS YOU HEARD THE JUDGE INSTRUCT, HIS

12     HONOR, A COPYRIGHT ALLOWS THE HOLDER OF A COPYRIGHT TO

13     EXCLUDE OTHERS FROM USING COPYRIGHTED WORKS IN CERTAIN

14     CIRCUMSTANCES.

15              WHAT THIS CASE IS ABOUT IS THE BOUNDARIES

16     OF THAT RULE BECAUSE THE FAIR USE DOCTRINE PROVIDES AN

17     EXEMPTION WHERE THIRD PARTIES CAN USE A COPYRIGHTED

18     WORK WITHOUT PAYING A LICENSE FEE, WITHOUT SEEKING

19     PERMISSION, WITHOUT OBTAINING CREDIT OR PROVIDING

20     CREDIT FOR DOING SO.

21              THE VARIETY OF FAIR USE THAT WE'RE

22     TALKING ABOUT TODAY IS SOMETHING KNOWN AS "COMMENT AND

23     CRITICISM" THROUGHOUT THIS TRIAL.

24              RAY WILLIAM JOHNSON, THE

25     COUNTER-DEFENDANT AND THE OWNER OF EQUALS THREE,

1  SITTING HERE IN THE COURTROOM, IS A YOUTUBE SENSATION.

2  HE CREATED A COMEDY SHOW CALLED "THE EQUALS THREE SHOW"

3  THAT'S DISTRIBUTED AND STREAMED OVER YOUTUBE.  HE

4  CREATED IT IN 2009 AT THE VERY BEGINNING OF WHAT

5  YOUTUBE HAS BECOME TODAY.  AND HE CREATED A SHOW THAT

6  WAS A CUTTING-EDGE SHOW THAT ENABLED HIM TO HAVE A

7  VOICE, TO PROVIDE A VOICE TO COMMENT AND CRITICIZE

8  CONTENT ON THE INTERNET THAT YOU SEE, ITEMS THAT HAVE

9  BEEN PUBLISHED ON THE INTERNET, ON YOUTUBE AND OTHER

10  PLACES SHARED AMONG THE INTERNET.

11          MR. JOHNSON HAS BUILT A GROUP OF

12  FOLLOWERS, CLOSE TO 11 MILLION SUBSCRIBERS TO HIS

13  CHANNEL, THAT LIKE TO HEAR THE COMMENTARY, THE

14  CRITICISM AND THE WIT OF THE EQUALS THREE SHOW.

15          THE PURPOSE OF COMING HERE TO THIS FORUM

16  IS BECAUSE JUKIN MEDIA IS PREVENTING HIM FROM

17  EXPRESSING HIS VOICE - THAT'S WHAT THE EVIDENCE IS

18  GOING TO SHOW - BY STOPPING HIM FROM PUBLISHING AND

19  DISPLAYING AND MONETIZING THE EPISODES OF HIS SHOW.

20          THE PURPOSE OF FAIR USE IS NOT AN EXCUSE

21  TO ALLOW SOMEBODY TO INFRINGE SOMEBODY ELSE'S WORK.

22  IT'S NOT THAT AT ALL.  FAIR USE IS A RIGHT, A RIGHT

23  THAT ARISES UNDER THE FIRST AMENDMENT THAT ALLOWS

24  PEOPLE TO COMMENT AND TO CRITICIZE AND TO PARODY OTHER

25  WORKS SO THAT, IN SOME RESPECTS, ALL OF THE SOCIETY MAY

1    BENEFIT FROM IT.

2                    RAY JOHNSON STARTED IN THIS INDUSTRY AS A

3    U.S. HISTORY MAJOR AT COLUMBIA, WHO STARTED MAKING

4    VIDEOS, A VIDEO BLOG, WHERE HE WOULD CRITICIZE AND

5    COMMENT ON THINGS THAT POLITICAL FIGURES WOULD DO.  AND

6    FROM THERE, HE REALIZED THAT THIS FORUM GAVE HIM A

7    VOICE, AN OPPORTUNITY TO SPEAK TO, POKE FUN AT, TO

8    RIDICULE THINGS THAT HAPPEN IN OUR LIVES.  AND FROM

9    THAT EXPERIENCE, HE TOOK THAT AND CREATED THE EQUALS

10   THREE SHOW IN ORDER TO DO THAT IN A NON-POLITICAL WAY,

11   BUT IN A WAY THAT FOCUSES ON HOW WE LIVE IN OUR

12   EVERYDAY LIVES, HOW PEOPLE LIVE IN THEIR EVERYDAY

13   LIVES, THE DECISIONS THEY MAKE AND WHATNOT.

14                    SO AN EQUALS THREE SHOW EPISODE IS A

15   FORMATTED-HOSTED SHOW THAT STARTS WITH SOME

16   INTRODUCTORY COMMENTARY AND JOKES.  IT'S A COMEDIC

17   SHOW.  IT TELLS ALL SORTS OF JOKES AND COMMENTARY ABOUT

18   THINGS YOU WOULD SEE IN YOUR DAILY LIFE, LIKE SATURDAY

19   NIGHT LIVE OR OTHER TYPES OF SHOWS WOULD DO.

20                    THE FORMAT OF THE SHOW IS BUILT AROUND

21   TAKING THREE SOURCE VIDEO CLIPS.  SOMETIMES IT'S TWO.

22   SOMETIMES IT'S ONE.  BUT, GENERALLY SPEAKING, THREE

23   SOURCE VIDEO CLIPS AND POKING FUN AT, RIDICULING,

24   COMMENTING ON AND CRITICIZING THINGS THAT HAVE HAPPENED

25   IN THAT VIDEO.  THEY DIRECTLY TARGET WHAT'S HAPPENED IN

1     THE VIDEO.  AND THEY DIRECTLY TARGET THINGS PEOPLE HAVE

2     SAID, WHAT THEY HAVE DONE AND WHY THEY HAVE DONE THEM.

3              THE ISSUE IN THIS CASE IS THE USE OF THE

4     SOURCE VIDEOS.  BECAUSE MR. JOHNSON USES COMMENTARY AND

5     CRITICISM AND, AS THE JUDGE HAS INSTRUCTED, DOES THINGS

6     TO TRANSFORM THE VIDEO, THE FAIR USE DEFENSE APPLIES.

7     AND WE HAVE TO PROVE THAT THAT FAIR USE DEFENSE

8     APPLIES.  AND WE'LL GET INTO THAT IN A MOMENT.

9              THE SOURCE VIDEOS AT ISSUE HERE ARE

10    VIDEOS THAT ARE OWNED OR CONTROLLED BY JUKIN MEDIA.

11    AND JUKIN MEDIA DOESN'T WANT MR. JOHNSON TO MAKE AND

12    USE HIS PARTICULAR BRAND OF WIT AND CRITICISM WITHOUT

13    PAYING THEM A LICENSE FEE.  AND THAT'S THE ISSUE.  CAN

14    SOMEBODY EXERCISE THEIR RIGHTS, THEIR FAIR USE RIGHTS

15    WITHOUT BEING FORCED TO COMPEL TO PAY A LICENSE FEE OR

16    SEEK PERMISSION?  AND THAT'S WHAT WE NEED YOU TO

17    DECIDE.

18             JUKIN MEDIA IS AN AGGREGATION COMPANY.

19    THEY OBTAIN LICENSE CONTENT.  THE TYPES OF CONTENT THAT

20    WE'RE TALKING ABOUT IS TYPICALLY WHAT WE COMMONLY REFER

21    TO AS "VIRAL VIDEOS," VIDEOS THAT YOU SEE ON FACEBOOK

22    AND TWITTER AND OTHER PLACES ON THE INTERNET, REDDIT,

23    THAT ARE SHARED BY YOUR FRIENDS AND FAMILIES.  THOSE

24    TYPES OF VIDEOS.  JUKIN OBTAINS PERMISSION FROM THE

25    ORIGINAL OWNER/UPLOADER OF THOSE VIDEOS TO OBTAIN THE

```
 1    RIGHTS, AND THEN LICENSES THOSE RIGHTS TO THIRD
 2    PARTIES, TELEVISION STATIONS AND OTHER PLACES, OTHER
 3    WEB CONTENT AND WHATNOT.
 4               THE PROBLEM WITH THAT ISSUE WAS, THAT
 5    JUKIN MEDIA TAKES ISSUE, OBVIOUSLY, WITH HOW EQUALS
 6    THREE HAS USED ITS SHOW AND DOESN'T BELIEVE IT SHOULD
 7    OR CAN.  AND AS A RESULT THROUGH A MECHANISM ON
 8    YOUTUBE --
 9          THE COURT:  LET'S NOT GET INTO --
10          MR. VIDAL:  YOU DON'T WANT TO GET INTO THAT,
11    YOUR HONOR?  THAT'S FINE.
12               SO WE'RE GOING TO FOCUS RIGHT NOW ON THE
13    FAIR USE ISSUES.  I REALIZE THERE'S SOME CONTEXT THAT'S
14    ABSENT IN TERMS OF HOW THE PARTIES LED TO WHERE THEY
15    WERE, BUT IT'LL KEEP US FOCUSED TO WHERE WE ARE.
16               SO LET'S TURN TO THE JURY INSTRUCTIONS
17    THAT THE COURT HAS JUST READ.
18               IN ORDER TO PROVE FAIR USE, THERE ARE
19    FOUR FACTORS THAT THE COURT JUST INSTRUCTED YOU ABOUT.
20               WE WILL HAVE SOME WITNESSES ON THE STAND,
21    MR. JOHNSON HIMSELF, ANOTHER WITNESS NAMED "KELLY
22    LANDRY," WHO ARE WRITERS ON THE SHOW, WHO WILL COME AND
23    SPEAK TO YOU ABOUT HOW THE SHOW WAS CREATED AND WHAT
24    THEY DID.
25               AND THEY WON'T SPEAK TO YOU WITH THE
```

1    PRECISION OF A JUDGE OR THE ELOQUENCE OF AN ADVOCATE.

2    THEY MIGHT NOT BE COTTON MOUTH LIKE I AM RIGHT NOW

3    BECAUSE THEY'RE PERFORMERS IN SOME RESPECTS.  BUT THEY

4    WILL SPEAK TO YOU IN COMMON EVERYDAY LANGUAGE.  THEY

5    WON'T NECESSARILY BE ABLE TO GIVE YOU -- THEY'RE NOT

6    STUDENTS OF THE LAW.  THEY'RE NOT ATTORNEYS.  THEY

7    WON'T BE ABLE TO TELL YOU WITH THE PRECISION WHAT THIS

8    CASE SAID OR THAT CASE OR HOW PARODY WAS DEFINED ONE

9    WAY OR ANOTHER WAY.  BUT THEY WILL SPEAK AS CREATORS

10   SPEAK.  THEY WILL TALK ABOUT HOW THEY COMMENT AND

11   CRITICIZE IN THEIR VIDEOS, HOW THEY DO THINGS TO THE

12   SOURCE VIDEOS THAT TURN REALITY ON ITS HEAD, THAT POKE

13   FUN, THAT RIDICULE, THAT CREATE CHARACTERS AND

14   ALTERNATIVE NARRATIVES.

15               WHEN WE WATCH ONE OF THESE SNIPPETS OF A

16   VIDEO, A VIRAL VIDEO THAT WE'VE SEEN ON YOUTUBE,

17   AUDIENCES DON'T KNOW THE BACK-STORY.  WHAT EQUALS THREE

18   DOES WITH ITS UNIQUE BRAND OF COMMENTARY AND WIT IS TO

19   MAKE JOKES ABOUT THAT AND TO FILL THAT BACK-STORY AND

20   TELL PEOPLE WHY THE PEOPLE ARE DOING WHAT THEY'RE

21   DOING, MAKE FUN OF WHO THEY ARE AND THE DECISIONS THAT

22   THEY HAVE MADE.  THEY PERSONIFY OBJECTS LIKE TREES AND

23   OTHER ITEMS.  THEY -- YOU KNOW, REDUCTIONS, FASHION,

24   BREAK DOWN ALL THE ELEMENTS IN THOSE EPISODES AND IN

25   THOSE SOURCE VIDEOS TO COMMENT AND CRITICIZE ON WHO

1    PEOPLE ARE AND WHY THEY'RE DOING THE THINGS THEY'RE

2    DOING.

3                    THEY MAKE SKETCHES.  THEY MIMIC THE

4    PEOPLE.  THEY MIMIC THE BEHAVIORS.  AND A LOT OF TIMES,

5    THE CHARACTERS THAT THEY HAVE CREATED THROUGHOUT THESE

6    SHOWS ARE CHARACTERS THAT THEY HAVE USED IN OTHER

7    EPISODES, SO THEY HAVE LONGEVITY BEYOND A SHORT

8    EPISODE.

9                    THE JUDGE ALSO MENTIONED THAT THE NATURE

10   OF THE COPYRIGHTED WORK, WHETHER IT WAS AN UNPUBLISHED

11   WORK THAT WAS BEING USED IN THIS FASHION OR NOT WAS AN

12   IMPORTANT DETERMINATION FOR YOU.  YOU'LL FIND THE

13   EVIDENCE WILL SHOW IN THIS CASE THAT ALL OF JUKIN

14   MEDIA'S VIDEOS THAT ARE AT ISSUE HERE WERE PUBLISHED

15   WORKS.  THEY WERE PUBLISHED ON THE INTERNET AND

16   YOUTUBE.  THEY WERE SHARED IN A VARIETY OF PLACES.

17                   YOU'LL ALSO SEE, AS YOU WATCH THOSE

18   VIDEOS, SOMETHING ELSE THAT'S IMPORTANT.  THAT THE

19   VIDEOS DEPICT FACTUAL EVENTS IN LIFE, ON BALANCE, MOST

20   OF THE TIME.  NOT ALWAYS, BUT IN MANY OF THOSE

21   CIRCUMSTANCES.  AND THOSE FACTUAL VIDEOS MAY BE LESS

22   CLOSE TO THE CORE OF PROTECTION THAT COPYRIGHT

23   PROTECTS, WHICH WAS DISCUSSED IN THAT INSTRUCTION.

24                   THIRD, THE COURT TALKED ABOUT THE AMOUNT

25   AND SUBSTANTIALITY OF THE PORTION THAT SOMEBODY LIKE

1    EQUALS THREE WOULD USE WHEN USING AN EPISODE.

2             IN THIS CIRCUMSTANCE, THE -- YOU'LL HEAR

3    EVIDENCE FROM MR. JOHNSON, FROM MS. LANDRY AND YOU WILL

4    SEE IT WHEN YOU WATCH THE VIDEOS, THAT THE AMOUNT OF

5    THE JUKIN VIDEOS THAT WERE USED WERE JUST ENOUGH TO

6    MAKE THE JOKE, MAKE THE POINT AND MOVE ON FROM THERE.

7    THEY DIDN'T USE ANY MORE THAN WHAT THEY NEEDED.

8             ANOTHER FACTOR THAT WILL BECOME

9    IMPORTANT, AS ALL OF THEM ARE BECAUSE YOU HAVE TO

10   BALANCE THEM, IS THE EFFECT ON THE MARKET.  THE

11   QUESTION OF WHEN A WORK LIKE EQUALS THREE WORK IS A

12   WORK THAT COMMENTS OR CRITICIZES, A PARODY, THE MARKET

13   HARM THAT'S COGNIZABLE IS WHAT WE CALL THE

14   "SUBSTITUTIONARY EFFECT."

15            THE EVIDENCE WILL NOT SHOW THAT EQUALS

16   THREE'S EPISODES ARE A SUBSTITUTE FOR THE JUKIN VIDEOS.

17   THE PURPOSE OF THE EQUALS THREE VIDEOS ARE DIFFERENT

18   THAN -- THE PURPOSE OF THE EQUALS THREE EPISODES IS

19   DIFFERENT FROM THE PURPOSE OF THE JUKIN VIDEOS.  YOU

20   WILL SEE THAT THE VIEWERSHIP OF AN EQUALS THREE EPISODE

21   IS A SUBSCRIBER-BASED VIEWERSHIP.  IT'S

22   APPOINTMENT-BASED VIEWING.  MUCH LIKE WHEN YOU WATCH A

23   SHOW ON THURSDAY NIGHT ON NBC OR WHATEVER CHANNEL YOU

24   WATCH, YOU SHOW UP AT A CERTAIN TIME.  YOU DON'T HAVE

25   TO.  IT'S ON YOUTUBE.  IT'S AVAILABLE.  BUT THE MODEL

1    IS APPOINTMENT VIEWING.  PEOPLE WATCH THOSE EPISODES.

2              A VIRAL VIDEO, ON THE OTHER HAND, THE

3    EVIDENCE WILL SHOW, IS A VIDEO THAT STANDS ALONE.

4    PEOPLE WATCH IT IN AND OF ITSELF FOR THE REASONS THEY

5    WATCH IT AND SHARE THOSE VIDEOS.

6              EQUALS THREE WILL ALSO DEMONSTRATE THAT

7    THE -- ANOTHER REASON THAT IT'S NOT A -- ITS SHOW IS

8    NOT A SUBSTITUTE FOR THE JUKIN VIDEOS IS BECAUSE ITS

9    SUBSCRIBER BASE CHANGES AS THE HOST CHANGES.  AN

10   IMPORTANT FACTOR THAT THE EVIDENCE WILL SHOW IS THAT

11   THE HOST OF AN EQUALS THREE SHOW IS AN IMPORTANT FACTOR

12   IN WHY PEOPLE WATCH WHAT THEY WATCH AND WHAT PEOPLE GET

13   OUT OF THE SHOW.

14             AND, ULTIMATELY, THE EVIDENCE WILL SHOW

15   THAT THE MARKET SERVED DIFFERENT PURPOSES.  AND THOSE

16   PURPOSES ARE, AGAIN, A VIRAL VIDEO WHICH STANDS ALONE

17   VERSUS A SHOW THAT DISPLAYS AND TALKS ABOUT DIFFERENT

18   VIDEOS, TO MAKE -- TO DRAW OUT FACTS ABOUT THOSE VIDEOS

19   AND TO CREATE A NEW WORK THAT COMMENTS ON THE PEOPLE

20   THAT ARE IN THE VIDEOS AND DEVELOPS A NEW NARRATIVE AND

21   ALTERNATIVE STORY LINES.

22             EQUALS THREE WILL ALSO SHOW THAT JUKIN'S

23   VIDEOS HAD INCREASED VIEWERSHIP AFTER THEY HAVE BEEN

24   REVIEWED IN AN EQUALS THREE EPISODE.

25             I'D LIKE TO SHOW AN EXAMPLE OF ONE OF

```
1    THESE EPISODES SO YOU CAN SEE WHAT WE'RE LOOKING AT AND

2    WHAT YOU CAN EXPECT.

3              YOUR HONOR, IF THAT'S --

4         THE COURT:  I THINK -- I WOULD DO THAT, BUT I

5    WOULD -- THIS IS JUST OPENING STATEMENT.  I THINK YOU

6    HAVE, YOU KNOW, ADEQUATELY DESCRIBED WHAT YOU EXPECT

7    THE EVIDENCE TO BE FROM YOUR STANDPOINT.  WE'RE GOING

8    TO SHOW ALL THESE VIDEOS TO THE JURY.  LET'S NOT DO IT

9    MORE THAN WE HAVE TO.

10         MR. VIDAL:  VERY WELL.

11              I WOULD LIKE TO MAKE ONE OTHER POINT, AND

12   THEN I'LL WRAP UP MY CLOSING STATEMENT.

13              THE VIDEOS THAT YOU SEE ARE TARGETED AND

14   DESIGNED FOR A SPECIFIC AUDIENCE.  IT'S TYPICALLY

15   YOUNGER COLLEGE-AGED GUYS.  AND THERE'S SOME EDGY

16   THINGS THAT YOU WILL SEE IN THE VIDEO, LANGUAGE,

17   SOMETIMES A LITTLE CRASS HUMOR.  IT'S -- SOMETIMES IT'S

18   GRAPHIC IN TERMS OF LANGUAGE THAT'S USED AND THOSE

19   KINDS OF THINGS.

20              THE ISSUE WITH FAIR USE AND HOW IT'S USED

21   AND THE TYPES OF PURPOSES THAT ARE ADDRESSED HERE ARE

22   NOT DETERMINED BY THOSE KINDS OF THINGS.  THERE IS A

23   BRAND OF THAT HUMOR.  THERE IS A BRAND OF PARODY THAT

24   SOME PEOPLE GET AND SOME PEOPLE DON'T GET.  SO AS YOU

25   WATCH THE VIDEOS, KEEP IN MIND THAT THERE IS AN
```

```
 1    AUDIENCE THAT IS 11-MILLION STRONG THAT WATCHES THESE
 2    SHOWS AND ENJOYS THEM.
 3              SO WITH THAT, WE WILL ESTABLISH THE
 4    ELEMENTS OF FAIR USE AND SHOW THAT EQUALS THREE'S WORK
 5    IS A FAIR USE.
 6              THE COURT:  THANK YOU, SIR.
 7              DOES JUKIN WISH TO MAKE AN OPENING AT
 8    THIS POINT?
 9              MS. GRANT:  YES, YOUR HONOR.
10              THE COURT:  ALL RIGHT.
11              MS. GRANT:  GOOD MORNING, LADIES AND
12    GENTLEMEN.
13              MY NAME IS JESSICA GRANT.  AND I
14    REPRESENT JUKIN MEDIA, ALONG WITH ONE OF MY COLLEAGUES,
15    TAMMANY VINSON BENTZ.
16              AND I'D ALSO LIKE TO INTRODUCE YOU TO THE
17    FOUNDER AND CEO OF JUKIN MEDIA, JONATHAN SKOGMO.
18    YOU'LL HEAR FROM HIM LATER ON IN THIS TRIAL.
19              THERE'S ONE OTHER PERSON I WANT TO
20    INTRODUCE, MR. CHRIS REYNOLDS.  HE WILL BE HELPING ME
21    PUT UP SOME OF THE GRAPHICS AND VIDEOS THAT YOU'LL SEE
22    IN THIS TRIAL.
23              AND AS THE JUDGE SAID, THANK YOU VERY
24    MUCH FOR YOUR SERVICE.  EVEN THOUGH THIS IS A SHORT
25    TRIAL, IT'S STILL AN IMPOSITION IN YOUR PERSONAL AND
```

1    PROFESSIONAL LIVES.  AND SO ON BEHALF OF ALL OF US, I

2    WANT TO THANK YOU FOR YOUR SERVICE BECAUSE IT'S VERY

3    IMPORTANT, AS THE JUDGE SAYS, THIS WHOLE PROCESS TO

4    MAKE SURE THAT PEOPLE GET A FAIR TRIAL.

5                    AND THIS IS A VERY IMPORTANT CASE TO

6    MR. SKOGMO AND TO JUKIN BECAUSE THIS IS A CASE ABOUT

7    MR. JOHNSON TAKING VIDEOS THAT OTHER PEOPLE HAVE MADE,

8    PUTTING THEM IN HIS SHOW, MAKING MONEY OFF OF THEM AND

9    NOT PAYING A PENNY TO THE PEOPLE THAT CREATED THOSE

10   VIDEOS.

11                   NOW, AS YOU HEARD HIS LAWYER JUST SAY, HE

12   HAS ABOUT 11 MILLION SUBSCRIBERS TO HIS CHANNEL.  AND

13   PEOPLE COMPETE JUST LIKE ON THE INTERNET, THESE TYPES

14   OF SHOWS.  IT'S THE SAME THING AS REGULAR T.V. SHOWS.

15   THEY COMPETE FOR AUDIENCE AND THE VIEWERS.  AND SO THE

16   FACT THAT HE TAKES THE VIDEOS THAT BELONG TO JUKIN --

17   CAUSE JUKIN HAS ITS OWN CHANNEL, LIKE FAILARMY WHERE

18   PEOPLE TRY THINGS AND THEY FAIL.  THEY CRASH AND IT

19   DOESN'T WORK OUT.  THEY TAKE OUR VIDEOS, AND THEY PUT

20   THEM IN THEIR SHOW AND MAKE MONEY IN THEIR SHOW WITHOUT

21   PAYING A STANDARD LICENSE FEE.

22                   AND WE OFFERED THAT TO MR. JOHNSON, $350

23   PER VIDEO.  AND HE SAID, NO.  BECAUSE HIS ENTIRE

24   BUSINESS MODEL - AND YOU'LL HEAR THIS FROM THE EVIDENCE

25   AND HIS SWORN TESTIMONY IN THIS CASE - IS THAT IN THE

```
1    LIFE OF HIS SHOW, HE'S TAKEN 2,000 VIDEOS THAT WERE

2    MADE BY OTHER PEOPLE - JUST REGULAR, EVERYDAY PEOPLE -

3    AND HE'S USED THOSE 2,000 VIDEOS IN HIS SHOW.  AND HE'S

4    NEVER ONCE PAID A PENNY TO THE PEOPLE WHO CREATED THOSE

5    VIDEOS.

6              SO THIS CASE IS NOT ABOUT USING A VIDEO

7    ON YOUTUBE AND/OR FACEBOOK AND SHARING IT WITH YOUR

8    FRIENDS OR YOUR FAMILY.  THIS IS A CASE WHERE SOMEONE

9    TAKES SOMEONE ELSE'S VIDEO.  THEY MAKE MONEY OFF OF IT,

10   AND THEY DON'T SHARE ANY OF THAT MONEY WITH THE PEOPLE

11   WHO ACTUALLY MADE THE VIDEO.

12             AND YOU WILL SEE FROM THE EVIDENCE THAT

13   HIS ENTIRE SHOW IS BUILT AROUND THE VIDEOS THAT ARE

14   MADE BY OTHER PEOPLE.  WITHOUT THE FUNNY -- AND YOU'LL

15   SEE THESE VIDEOS, AS THE JUDGE SAID.  WITHOUT THESE

16   FUNNY AND SOMETIMES THEY'RE SILLY OR ABSURD -- A FEW OF

17   THEM ARE ACTUALLY PRETTY POIGNANT.  WITHOUT THESE

18   VIDEOS THAT WERE MADE BY OTHER PEOPLE, HIS SHOW WOULD

19   NOT EVEN EXIST.  BECAUSE YOU WILL HEAR FROM THE

20   EVIDENCE, HE DIDN'T GO OUT AND FILM ANY OF HIS OWN

21   VIDEOS.  HE JUST WENT TO THE INTERNET, TOOK WHAT HE

22   WANTED FROM OTHER PEOPLE, PUT IT IN HIS SHOW TO MAKE

23   MONEY.  THAT'S WHAT THIS CASE IS ABOUT.

24             AND HE DID IT, WITH REGARD TO JUKIN'S

25   VIDEOS, ON 40 DIFFERENT OCCASIONS.  HE TOOK JUKIN'S
```

```
1    VIDEOS 40 DIFFERENT TIMES, AND THAT'S WHY YOU'RE GOING

2    TO WATCH 40 DIFFERENT VIDEOS.  YOU'LL FIRST WATCH THE

3    ORIGINAL JUKIN VIDEO.  AND THEN YOU'LL WATCH THE

4    EPISODE OF MR. JOHNSON'S SHOW THAT FEATURED THE JUKIN

5    VIDEO.  AND YOU'RE GOING TO BE ASKED TO DETERMINE, DID

6    MR. JOHNSON CREATE SOMETHING TOTALLY TRANSFORMATIVE,

7    TOTALLY NEW, OR DID HE JUST BASICALLY TAKE JUKIN'S

8    VIDEO, THE HEART OF THE VIDEO WHICH MAKES IT FUNNY OR

9    ENTERTAINING, ADD SOME JOKES AND SOME COMMENTARY AND

10   THINGS LIKE THAT?  THAT'S NOT TRANSFORMING IT INTO

11   SOMETHING DIFFERENT.

12             YOU'LL SEE EXAMPLES IN THIS CASE OF --

13   EXAMPLES LIKE CONAN, THE LATE-NIGHT HOST, THEY USE

14   JUKIN'S VIDEOS.  THEY LICENSE JUKIN'S VIDEOS, PAY THE

15   FEE.  WHETHER IT'S JIMMY FALLON, CONAN, JIMMY KIMMEL,

16   ELLEN, THE PEOPLE WHO --

17             THE COURT:  WHY IS THAT RELEVANT?

18             MS. GRANT:  MARKET HARM, YOUR HONOR.

19             THE COURT:  I SEE.

20             OKAY.  GO AHEAD.

21             MS. GRANT:  SO THEY TAKE THESE VIDEOS, AND

22   THEY COMMENT ON THEM.  THEY MAKE JOKES, IF YOU HAVE ALL

23   SEEN JIMMY KIMMEL.

24             AND I THINK YOU'RE GOING TO SEE A VIDEO

25   IN THIS CASE THAT CONAN O'BRIEN DID.  AND HE TOOK A
```

1    VIDEO -- MAYBE SOME OF YOU HAVE SEEN IT.  IT'S CALLED

2    "RAT PIZZA."  IT'S ONE OF JUKIN'S VIDEOS.  IT'S THIS

3    LITTLE RAT, AND HE'S IN THE NEW YORK SUBWAY STATION.

4    AND HE ACTUALLY HAS THIS JUST GINORMOUS SLICE OF NEW

5    YORK PIZZA.  AND HE'S DRAGGING IT DOWN, I GUESS, TO HIS

6    HOME IN THE NEW YORK SUBWAY STATION.  AND SO CONAN TOOK

7    A CLIP.  I THINK IT WAS ABOUT 5 TO 7 SECONDS OF THE

8    ORIGINAL JUKIN VIDEO.  AND HE SAYS TO HIS AUDIENCE,

9    "WELL, NEW VIDEO HAS JUST BEEN RELEASED OF WHAT THE RAT

10   WAS DOING BEFORE HE WENT TO THE SUBWAY."  AND CONAN

11   CREATES THIS WHOLE NEW VIDEO.  HE SHOOTS AN ENTIRELY

12   NEW VIDEO WITH A LITTLE RAT PUPPET.  AND HE COMES IN,

13   AND HE COMES INTO A PIZZERIA.  AND HE PUTS LIKE A RAT

14   CHEF'S HAT ON AND A RAT'S APRON.  AND HE STARTS MAKING

15   THE PIZZA, AND HE'S ROLLING THE DOUGH, AND HE'S ADDING

16   THE MOZZARELLA, AND HE'S MAKING THE SAUSAGE.  CONAN

17   CREATES AN ENTIRELY NEW VIDEO THAT TRANSFORMED THE

18   ORIGINAL JUKIN VIDEO INTO SOMETHING ENTIRELY DIFFERENT.

19            YOU WON'T SEE ANYTHING LIKE THAT BECAUSE

20   MR. JOHNSON NEVER DID ANYTHING LIKE THAT.  HE NEVER

21   USED THE JUKIN VIDEO, ADD A LITTLE SNIP, AND THEN WENT

22   AND FILMED SOMETHING TOTALLY DIFFERENT.  HE JUST TOOK

23   THE VIDEO THAT WAS ALREADY FUNNY OR ENTERTAINING OR

24   SILLY OR ABSURD, AND HE MAKES SOME JOKES TO JUST

25   ACCENTUATE WHAT WAS ALREADY THERE.  HE DIDN'T CREATE

1    ANYTHING NEW.

2                     NOW, IF WE CAN SHOW NUMBER 1?

3                     SO YOU'RE GOING TO BE ASKED TO ANSWER ONE

4    QUESTION IN THIS CASE, HAS EQUALS THREE - THAT'S

5    MR. JOHNSON.  IT'S HIS COMPANY THAT HE OWNS - PROVED

6    THAT ITS USE OF JUKIN'S VIDEOS WAS FAIR USE?

7                     AND WE BELIEVE -- CAN WE GO THE NEXT ONE?

8                     THE ANSWER BASED ON THE EVIDENCE, NO, THE

9    EVIDENCE WILL SHOW THAT EQUALS THREE HAS NOT MET ITS

10   BURDEN WITH REGARD TO ITS USE OF JUKIN'S VIDEO.

11                    GO TO THE NEXT ONE.

12                    SO THE JUDGE GAVE YOU THE JURY

13   INSTRUCTION ABOUT THE FOUR FACTORS OF FAIR USE.  AND

14   THE FIRST FACTOR, YOU LOOK AT THE PURPOSE AND THE

15   CHARACTER OF THE USE.  AND SO ONE OF THE THINGS YOU'RE

16   GOING TO BE LOOKING AT IS, WAS HIS USE COMMERCIAL?

17   MEANING, DID HE MAKE MONEY OFF OF IT?  BECAUSE IF HE

18   DID, WHICH IS UNDISPUTED, THEN IT'S LESS LIKELY TO BE

19   FAIR USE AS CONTRASTED WITH IF YOU WERE USING IT FOR

20   NON-PROFIT, EDUCATIONAL PURPOSES.  SO THE FACT THAT

21   MR. JOHNSON IS TAKING JUKIN'S VIDEOS, PUTTING THEM IN

22   HIS SHOW AND MAKING A LOT OF MONEY OFF OF IT IS

23   SOMETHING THAT WEIGHS AGAINST FAIR USE.

24                    ONE OF THE OTHER THINGS YOU'RE GOING TO

25   BE LOOKING AT IS THE AMOUNT IN SUBSTANTIALITY OF THE

1    PORTION USED IN RELATION TO THE COPYRIGHTED WORK AS A

2    WHOLE.

3                    WHAT DOES THAT MEAN?  ESSENTIALLY, HOW

4    MUCH AND HOW IMPORTANT IS THE AMOUNT OF THE JUKIN VIDEO

5    THAT HE'S USING IN HIS SHOW?

6                    AND YOU WILL SEE, WHEN YOU LOOK AT THESE

7    VIDEOS, LADIES AND GENTLEMEN, THAT HE ALWAYS TAKES THE

8    HEART OF THE JUKIN VIDEO.  AND HE ALWAYS TAKES WHAT'S

9    ENTERTAINING.  AND THE REASON HE DOES THAT, AND HE HAS

10   ADMITTED UNDER OATH, IS BECAUSE HE'S LOOKING TO

11   ENTERTAIN HIS AUDIENCE.  SO HE'S TAKING THE

12   ENTERTAINING PARTS OF THE JUKIN VIDEO.

13                   WITH REGARD TO THE FIRST FACTOR AGAIN --

14   IF WE CAN GO TO THE NEXT DEMONSTRATIVE, CHRIS?

15                   SO THE FIRST FACTOR, AGAIN, GOES TO THE

16   NATURE AND PURPOSE OF THE USE.  AND SO ONE OF THE

17   FACTORS THAT THE JUDGE JUST TOLD YOU ABOUT THAT YOU

18   LOOK AT IS, WELL, WAS THE WORK TRANSFORMATIVE?

19                   SO LIKE IN THE CONAN EXAMPLE WHERE HE

20   TOOK A LITTLE PORTION OF OUR RAT PIZZA VIDEO AND

21   CREATED A WHOLE NEW VIDEO ABOUT WHAT THE RAT WAS DOING

22   BEFORE HE GOT INTO THE PIZZA, HE'S MAKING PIZZA, MAKING

23   SAUSAGE, THAT'S TRANSFORMATIVE.  THAT'S TAKING

24   SOMETHING, A LITTLE BIT OF THE ORIGINAL AND TUNING IT

25   INTO SOMETHING NEW.

```
 1              THE COURT:  YOU KNOW, I DON'T MEAN TO

 2    INTERRUPT, BUT YOU ARE ARGUING YOUR CASE.

 3              MS. GRANT:  THANK YOU, YOUR HONOR.

 4              THE COURT:  AND THIS IS NOT THE TIME TO ARGUE.

 5              I SHOULD ALSO SAY THAT PLAINTIFF -- I

 6    MEAN, THAT EQUALS THREE DID SOME OF THE SAME.

 7              BUT THE PURPOSE OF OPENING STATEMENT IS

 8    JUST TO LET THE JURY KNOW WHAT THE EVIDENCE IS GOING TO

 9    BE SO THAT THEY HAVE SOME SORT OF ROAD MAP OR SOMETHING

10    TO FOLLOW IT, NOT TO ARGUE.

11              YOU'LL -- I'M GOING TO GIVE YOU THE

12    OPPORTUNITY TO ARGUE, AS I SAID, AFTER EVERY 10

13    EPISODES AND THEN AGAIN AT THE END OF THE CASE.  SO TRY

14    AND RESIST THAT AT THIS TIME.

15              MS. GRANT:  THANK YOU, YOUR HONOR.  I

16    APPRECIATE IT.

17              SO ONE OF THE FACTORS IS, YOU'RE LOOKING

18    AT WHETHER OR NOT IT'S TRANSFORMATIVE.  AND I THINK

19    AFTER YOU SEE THE VIDEOS IN THIS CASE, YOU WILL

20    UNDERSTAND THE EVIDENCE WILL SHOW THAT HE DID NOT

21    TRANSFORM THE JUKIN VIDEO INTO SOMETHING ENTIRELY NEW.

22              IF WE CAN GO TO NUMBER 9, CHRIS?

23              SO YOU HEARD THE JUDGE SAY SOMETHING

24    ABOUT A LICENSE.  AND YOU'RE GOING TO HEAR THAT TERM A

25    LOT IN THIS CASE.  WE'RE TALKING ABOUT LICENSING FEES,
```

1  AND THAT'S THE MARKET THAT JUKIN'S BUSINESS IS BUILT

2  UPON.

3          AND MR. SKOGMO -- YOU HEARD ABOUT HOW

4  MR. JOHNSON STARTED HIS CHANNEL.  MR. SKOGMO WAS

5  WORKING ON A SHOW SIMILAR TO AMERICA'S FUNNIEST HOME

6  VIDEOS WHERE HE WAS LICENSING CLIPS TO USE IN OTHER

7  PEOPLE'S SHOWS.

8          AND WHAT IS A LICENSE?  IT'S,

9  ESSENTIALLY, WHERE SOMEONE WHO CREATES SOMETHING GRANTS

10  ANOTHER PERSON THE RIGHT TO USE THEIR CONTENT - IN THIS

11  CASE VIDEOS - IN EXCHANGE FOR A LICENSING FEE.  THAT'S

12  ESSENTIALLY WHAT IT IS.

13          SO WE HAVE TWO WAYS THAT LICENSES COME

14  INTO PLAY HERE.  MR. SKOGMO'S COMPANY, JUKIN, WHEN

15  SOMEONE MAKES A VIDEO, HE APPROACHES THEM, FINDS THEM,

16  WHICH SOMETIMES CAN TAKE A LOT OF EFFORT, AND HE ASKS,

17  "DO YOU WANT TO LICENSE YOUR VIDEOS SO THAT IF OTHER

18  PEOPLE USE IT, THEY WOULD PAY YOU A FEE?"  AND IT'S

19  USUALLY A PRETTY NOMINAL FEE.

20          AND SO IF THE CREATOR ENTERS INTO A

21  LICENSE WITH JUKIN, THEN JUKIN, PEOPLE KIND OF KNOCK ON

22  THEIR DOOR, ADVERTISING AGENCIES, T.V. SHOWS, AND SAY,

23  "HEY, WE SAW THAT VIDEO.  CAN WE LICENSE IT?"  AND SO

24  WHEN THEY DO, WHEN THAT HAPPENS -- I THINK IT'S NUMBER

25  12.

```
 1              SO YOU CAN SEE, THE CREATOR ENTERS INTO A

 2   LICENSE WITH JUKIN.  JUKIN THEN GETS LICENSING REVENUE

 3   FROM ADVERTISING OR T.V. OR OTHER ONLINE SOURCES.  AND

 4   THEN THAT ADVERTISING REVENUE GOES BACK TO THE CREATOR,

 5   BACK TO THE PERSON WHO MADE THE VIDEO.  AND THAT'S

 6   BASICALLY HOW IT WORKS IN TERMS OF THESE LICENSES THAT

 7   YOU'RE GOING TO BE HEARING ABOUT.

 8              THE LAST FACTOR OF THE FOUR FACTORS IS

 9   SOMETHING THAT THE JUDGE REFERRED TO.  IT INVOLVES HARM

10   TO JUKIN'S MARKET.  AND AS A RESULT OF MR. JOHNSON'S

11   UNAUTHORIZED USE OF JUKIN'S COPYRIGHTED VIDEOS, DID

12   THAT CAUSE HARM TO JUKIN'S ABILITY TO GET LICENSING

13   REVENUE?  AND YOU WILL SEE IN THIS CASE THAT THE

14   EVIDENCE WILL SHOW THAT IT DID.

15              IF WE CAN GO TO THE NEXT DEMONSTRATIVE.

16              SO YOU WILL HEAR FROM SOMEONE -- I MEAN,

17   MR. SKOGMO WILL TALK ABOUT THIS.  BUT YOU WILL REALLY

18   HEAR FROM SOMEONE NAMED "JOHN GRANDE."  AND HE IS THE

19   HEAD OF DATA ANALYTICS AT JUKIN.  AND, ESSENTIALLY, HIS

20   MAIN JOB IS TO ANALYZE THE DATA FROM YOUTUBE IN TERMS

21   OF ALL THE PEOPLE WHO ARE WATCHING VIDEOS.  AND SO HE

22   WILL BE TESTIFYING, AND HE WILL EXPLAIN TO YOU HOW THE

23   DATA FROM YOUTUBE SHOWS THAT MR. JOHNSON'S UNAUTHORIZED

24   USE OF JUKIN'S VIDEOS CAUSES MORE UNAUTHORIZED COPIES.

25              IF WE CAN SHOW THE JURY AN EXAMPLE OF
```

```
1    THAT.  I THINK IT'S NUMBER 10, CHRIS.
2              AND IF EVER THERE'S A DELAY, IT'S NOT
3    CHRIS' FAULT.  IT'S MINE.
4              SO THIS IS AN EXAMPLE OF A SPIKE IN
5    INFRINGERS.  MEANING, PEOPLE -- OTHER PEOPLE TAKING
6    JUKIN'S VIDEOS AND USING IT WITHOUT OUR PERMISSION.
7    AND THAT ORANGE LINE IS WHEN MR. JOHNSON HAD POSTED HIS
8    EPISODE WITH THE JUKIN VIDEO.  AND YOU CAN SEE THAT
9    HUGE BLUE SPIKE IS A SPIKE RIGHT AFTER HE USES OUR
10   VIDEO AND OTHER PEOPLE COPYING, TAKING JUKIN'S VIDEO
11   AND DOING THE SAME THING HE'S DOING.  SO YOU WILL SEE
12   THAT HIS UNAUTHORIZED USE LEADS TO MORE UNAUTHORIZED
13   USES.
14             AND MR. GRANDE WILL EXPLAIN TO YOU HOW
15   MR. JOHNSON'S UNAUTHORIZED USE OF OUR VIDEOS ACTUALLY
16   REDUCES THE LICENSING REVENUE THAT JUKIN GETS.  FEWER
17   PEOPLE KNOCK ON JUKIN'S DOOR ASKING TO LICENSE THE
18   VIDEOS.  SO YOU WILL HEAR THAT EVIDENCE IN THIS CASE.
19             SO IF WE CAN GO BACK TO NUMBER 1?
20             SO AT THE END OF THIS CASE, LADIES AND
21   GENTLEMEN, AFTER YOU HAVE SEEN ALL OF THE EVIDENCE, YOU
22   WILL FILL OUT A FORM THAT THE JUDGE WILL GIVE YOU AND
23   THAT YOU WILL RENDER YOUR VERDICT.  AND FOR EACH OF THE
24   40 VIDEOS THAT MR. JOHNSON USED, IT WILL ASK YOU
25   WHETHER OR NOT HE HAS PROVED THAT HIS USE OF EACH JUKIN
```

```
1   VIDEO WAS FAIR.

2                AND JUKIN WILL ASK YOU TO CHECK "NO"

3   BASED ON THE EVIDENCE TO EVERY SINGLE ONE OF THOSE.

4   BECAUSE THE EVIDENCE WILL SHOW THAT MR. JOHNSON DID NOT

5   CREATE ANYTHING NEW.  HE ADDED SOME JOKES AND ADDED

6   SOME COMMENTARY, BUT IT DID NOT TRANSFORM IT INTO

7   SOMETHING NEW.  AND WE WILL ASK YOU TO CHECK "NO" ON

8   THOSE BECAUSE WHAT HE HAS DONE HAS HARMED JUKIN'S

9   MARKET IN TERMS OF LICENSING THESE VIDEOS.  AND WE

10  DON'T THINK IT'S FAIR THAT HE DIDN'T PAY THE FEE THAT

11  OTHER PEOPLE PAY FOR USING THE SAME CONTENT.

12           THANK YOU VERY MUCH FOR YOUR TIME.

13              (END OF PARTIAL TRANSCRIPT)

14

15

16

17

18

19

20

21

22

23

24

25
```

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES        )
                             )
STATE OF CALIFORNIA          )

                I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

STATES.

DATE:  APRIL 20, 2016



                        /S/ ALEXANDER T. JOKO
                        _____
                        ALEXANDER T. JOKO, CSR NO. 12272
                        FEDERAL OFFICIAL COURT REPORTER